IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOHNNIE BADON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-14-1868 |
| | § | |
| NABORS OFFSHORE CORPORATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER DENYING MOTION TO REMAND**

Johnnie Badon began working for Nabors Offshore Corporation in January 2013. He was assigned to work as a floorhand on Barge Rig 11, which frequently traveled back and forth between the company's wells in the Gulf of Mexico. (Docket Entry No. 13-1, at 2). On April 9, 2014, Nabors decommissioned Barge 11 and sold it that month. (Docket Entry No. 13, Ex. 1 at 20-21; Ex. 2). The next day, Badon was reassigned as a floorhand on Rig 85, a Nabors drilling structure attached to Chevron's Genesis Spar[1] in the Gulf. Badon alleges that on May 9, 2014, one month after his assignment to Rig 85, he injured his back, neck, and other body parts while moving pipe. (Docket Entry No. 1, Ex. A).

Badon sued Nabors in Texas state court, alleging negligence and unseaworthiness under the Jones Act, 45 U.S.C. § 51, *et seq.*, and seeking damages. (*Id.*, Ex. A). Nabors timely removed on the grounds that Badon was not a Jones Act seaman because Rig 85 and the Genesis Spar are not vessels, and that federal jurisdiction was proper under the Outer Continental Shelf Lands Act, 43

---

[1] "A spar is a nautical structure designed to float with the bulk of the hull below the waves—something akin to a giant buoy." *Fields v. Pool Offshore, Inc.*, 182 F.3d 353, 355 (5th Cir. 1999).

1

U.S.C. §§ 1331, *et seq.* (Docket Entry No. 1). Badon moved to remand, arguing that his substantial time on Barge 11, which the parties agree qualified as a vessel, made him a seaman under the Jones Act. (Docket Entry No. 12). Nabors responded, contending that Badon was permanently assigned to Rig 85 when Barge 11 was decommissioned and sold, making his previous vessel work irrelevant to his seaman status while working on Rig 85. (Docket Entry No. 13). Badon replied. (Docket Entry No. 14).

Based on the motion, the briefs, the pleadings, the record, and the applicable law, the court finds federal jurisdiction and denies Badon's motion to remand. The reasons are explained below.

I.  **The Applicable Legal Standards for Removing a Jones Act Claim**

A defendant has the right to remove a case to federal court when federal jurisdiction exists and the removal procedure is properly followed. *See* 28 U.S.C. § 1441. The removing party bears the burden of establishing that a state-court suit is removable to federal court. *See Carpenter v. Wichita Falls Indep. Sch. Dist.*, 44 F.3d 362, 365 (5th Cir. 1995) (citation omitted). Doubts about the propriety of removal must be resolved in favor of remand. *Waldrop v. Penn Treaty Network Am. Ins. Co.*, No. G-08-0149, 2008 WL 3287148, at *2 (S.D. Tex. Aug.6, 2008) (citing *In re Hot-Hed Inc.*, 477 F.3d 320, 323 (5th Cir. 2007) (per curiam)).

Badon brought his Jones Act claim in state court. When a plaintiff sues under the Jones Act, the defendant generally cannot remove. *Holmes v. Atl. Sounding Co.*, 437 F.3d 441, 445 (5th Cir. 2006), *abrogated on other grounds by Lozman v. City of Riviera Beach, Fla.*, 133 S. Ct. 735 (2013). If a Jones Act claim is improperly or "fraudulently" pleaded, however, the case is removable. *Id.* "[A] district court . . . may use a 'summary judgment-like procedure' to dispose of the assertion that the Jones Act claim was fraudulently pleaded." *Id.* (quoting *Burchett v. Cargill, Inc.*, 48 F.3d 173,

2

175 (5th Cir. 1995)). "The fact that Jones Act claims are ordinarily not removable does not prevent this inquiry. Lawsuits in which non-diverse defendants have been joined are ordinarily non-removable as well. Nonetheless defendants are permitted to demonstrate that parties — or claims — are baseless in law and fact and serve only to frustrate federal jurisdiction." *Lackey v. Atl. Richfield Co.*, 990 F.2d 202, 206 (5th Cir. 1993). "The removing party must show that there is no possibility that [the] plaintiff would be able to establish a cause of action." *Id.* at 207. "The court may deny remand where, but only where, resolving all disputed facts and ambiguities in current substantive law in the plaintiff's favor, the court determines that the plaintiff has no reasonable possibility of establishing a Jones Act claim on the merits." *Holmes*, 437 F.3d at 445 (quoting *Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 345–46 (5th Cir. 1999)). A plaintiff is "not required to produce evidence" supporting his claim at the removal stage. *Lackey*, 990 F.2d at 208.

To maintain a cause of action under the Jones Act, the plaintiff must be a seaman." *Hufnagel*, 182 F.3d at 346. "Under the Jones Act, a 'seaman' is a term of art for an employee whose duties 'contribut[e] to the function of the vessel or to the accomplishment of its mission' and who has 'a connection to a vessel in navigation . . . that is substantial in terms of both its duration and its nature.'" *Cain v. Transocean Offshore USA, Inc.*, 518 F.3d 295, 298 (5th Cir. 2008) (quoting *Chandris, Inc. v. Latsis,* , 515 U.S. 347, 368 (1995)).

A.  A "Vessel"

Title 1 U.S.C. § 3 defines a "vessel" as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." "Whether an unconventional craft is a vessel is an issue that is generally resolved as a matter of law, although . . . 'at the margin, fact issues may be presented.'" *Holmes*, 437 F.3d at 445 (quoting *Manuel v. P.A.W.*

3

*Drilling & Well Serv.*, 135 F.3d 344, 347 (5th Cir. 1998)). "Courts have long recognized a distinction between 'work platforms' that are designed for primarily stationary residence and true vessels." *Fields v. Pool Offshore, Inc.*, 182 F.3d 353, 357 (5th Cir. 1999) (citation omitted); *see also Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, (1969) ("[T]he Court has specifically held that drilling platforms are not within admiralty jurisdiction.") (citing *Phoenix Const. v. The Steamer Poughkeepsie*, 212 U.S. 558 (1908)).

In *Fields*, the Fifth Circuit has used a three-part test to determine whether work platforms are Jones Act vessels. *Fields*, 182 F.3d at 357–58. The factors are whether the craft was designed primarily to serve as a work platform, the structure was moored or otherwise secured at the time of the accident, and "the transportation function of the structure went beyond theoretical mobility and occasional incidental movement." *Id.* The Fifth Circuit applied this test in *Fields* to hold that a spar similar to the Genesis Spar was not a Jones Act vessel. Unlike other drilling rigs that were vessels, the spar at issue stayed in a field until it was exhausted. *Id.* at 358 (distinguishing *Manuel v. P.A.W. Drilling & Well Svc., Inc.*, 135 F.3d 344, 346 (5th Cir. 1998) (noting that the drilling vessel had been deployed at 19 different sites over 2 years); *Colomb v. Texaco, Inc.*, 736 F.2d 218, 221 (5th Cir. 1984) (involving a "highly mobile" submersible drilling barge "routinely" refloated and moved to the next location); *Blanchard v. Engine & Gas Compressor Svcs., Inc.*, 575 F.2d 1140, 1143 (5th Cir. 1978) (distinguishing a work platform from drilling rigs because there was no intention to move the platform "on a regular basis, as is done with submersible drilling rigs")). The evidence as to the first factor showed that the spar was designed primarily as a work platform.

As to the second factor, the *Fields* court noted that the spar's owner "at presumably considerable expense sunk massive (180 foot) pilings into the ocean floor," attached to the spar with

4

"similarly impressive" chain lines. "[L]ike its sibling conventional fixed production platforms, the [spar was] further anchored in position by the underwater infrastructure of extraction and exportation pipes that transport the petroleum from wellhead to the platform and from the platform to the shore." *Fields*, 182 F.3d at 358. These features supported the finding that the spar was not a vessel.

Similarly, in *Blanchard*, 575 F.2d at 1143, the court found that a compressor building mounted on a submersible barge differed from the structure at issue in *Hicks v. Ocean Drilling & Exploration Co.*, 512 F.2d 817, 823–24 (5th Cir. 1975). In *Hicks*, the submersible petroleum-storage barge was sunk to the ocean floor but not fixed to the seabed, had its own galley and crew quarters, was towed into position, and "was designed and constructed so that it could be raised for scraping and repair" and "could be moved to another site." *Id.* at 820. The *Hicks* court found that it was a vessel. *See id.* In *Blanchard*, by contrast, the compression building on the submersible barge had not been moved since its installation 20 years earlier. The barge was attached to the seabed with fixed pilings and steel cables. The barge carried no navigation lights or equipment, lifeboats, crew quarters, or bilge pumps. The purpose and business of the barge was as a fixed platform, not a vessel. 575 F.2d at 1142. *See also Hemba v. Freeport McMoran Energy Partners, Ltd.*, 811 F.2d 276, 278 (5th Cir. 1987) (a rig attached by pilings driven two hundred feet into the seabed was not a vessel).

As to the third factor, the court in *Fields* observed that the spar's only movement was between seven "closely packed wellheads to perform needed work." The court concluded: "[w]hile there remains some theoretical possibility of more lengthy movement when the current field is exhausted, the mere possibility of movement so many years hence cannot render irrelevant the structure's current and long-term immobility." *Id.* at 359.

5

Since *Fields*, the Supreme Court has further clarified the meaning of "vessel." In *Stewart v. Dutra Construction Company*, 543 U.S. 481, 497 (2005), the Court defined a vessel as "any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment." A vessel's primary purpose need not be navigation or transportation and the vessel need not be in motion when the seaman's injury occurs. *Stewart*, 481 U.S. at 495–96. "A ship and its crew do not move in and out of Jones Act coverage depending on whether the ship is at anchor . . . ." *Id.* at 494. On the other hand, "a watercraft is not 'capable of being used for maritime transport' in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement." *Id.* at 495. Applying this standard to a dredge, the Court concluded that it was a vessel. *See id.* at 490. The dredge was a "massive floating platform" from which a suspended clamshell bucket would "remov[e] silt from the ocean floor," depositing it "onto one of two scows" floating alongside the dredge. *Id.* at 484. Although the dredge could navigate only by "manipulating its anchors and cables" or by being towed, it had "a captain and crew, navigational lights, ballast tanks, and a crew dining area," and it moved over water "every couple of hours." *Id.* at 485.

*Stewart* distinguished two precedents, *Cope v. Vallette Dry-Dock Co.*, 119 U.S. 625 (1887), and *Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.*, 271 U.S. 19 (1926), in which the Court found that a floating drydock and a wharfboat were not vessels. *Stewart*, 543 U.S. at 493. The Court emphasized that the floating drydock in *Cope* had been moored to the shore for 20 years, making it a "'fixed structure' that had been 'permanently moored,' rather than a vessel that had been temporarily anchored." *Id.* at 493 (quoting *Cope*, 119 U.S. at 627). "*Evansville* involved a wharfboat secured by cables to the mainland. Local water, electricity, and telephone lines all ran

6

from shore to the wharfboat, evincing a 'permanent location.'" *Id.* (quoting *Evansville*, 271 U.S. at 22). The *Stewart* Court pointed to a Fifth Circuit case holding that a "floating casino was no longer a vessel where it 'was moored to the shore in a *semi*-permanent or indefinite manner" as an example of the "sensible" rule that "ships . . . do not remain vessels merely because of the remote possibility that they may one day sail again." *Id.* at 494 (quoting *Pavone v. Miss. Riverboat Amusement Corp.*, 52 F.3d 560, 570 (5th Cir. 1995)); *see also id.* (citing with approval *Kathriner v. UNISEA, Inc.*, 975 F.2d 657, 660 (9th Cir. 1992) (holding that a floating processing plant was no longer a vessel after a "large opening [had been] cut into her hull" making her incapable of moving over the water)).

In *Lozman v. City of Riviera Beach, Fla.*, 133 S. Ct. 735 (2013), the Supreme Court revisited these issues in considering whether a floating home was a vessel under 1 U.S.C. § 3. The Court rejected the broad "'anything that floats' approach" definition of a "vessel" that many circuit courts had adopted (including the Fifth Circuit in *Holmes*). The Supreme Court stated that the "mere capacity to float or move across navigable waters does not necessarily make a structure a vessel." *Id.* at 740, 743 (citations and quotations omitted). The right question is instead is whether "a reasonable observer, looking to the [structure's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things on water." *Id.* at 741. Applying that test, the Court concluded that the floating home was not a vessel for a number of reasons: (1) it lacked a "rudder or other steering mechanism"; (2) it did not have a raked hull; (3) its rectangular bottom sat only ten inches below the water line; (4) it could not generate or store its own electricity without a connection to land; (5) its rooms looked like ordinary living quarters; (6) it was incapable of self-propulsion; and (7) although capable of being towed over water, it had been

moved only four times over seven years. *Id.* at 741; *see also Martin v. Fab-Con, Inc.*, 9 F. Supp. 3d 642, 648 (E.D. La. 2014) (listing factors).

Although the Court rejected the "'anything that floats' approach," it did not abrogate *Fields* or *Stewart*. The Court noted that its "reasoning in *Stewart* support[ed] [its] conclusion," and cited *Stewart* in emphasizing the need to "apply [the vessel] definition in a 'practical,' not a 'theoretical' way." *Lozman*, 133 S. Ct. at 741. The Court clarified that its statements in *Stewart* that § 3 "does not require that a water craft be used primarily for that [transportation] purpose," that a "watercraft need not be in motion to qualify as a vessel," and that a structure may qualify as a vessel even if attached—but not "permanently" attached—to the land or ocean floor, simply meant "that the statutory definition *may* (or may not) apply" in those circumstances. *Id.* at 742. The Court explained why the dredge in *Stewart* qualified as a vessel but the wharfboat in *Evansville* did not:

> The basic difference, we believe, is that the dredge was regularly, but not primarily, used (and designed in part to be used) to transport workers and equipment over water while the wharfboat was not designed (to any practical degree) to serve a transportation function and did not do so.

*Id.* at 742-43.

In *Warrior Energy Services Corp. v. ATP Titan M/V*, 551 F. App'x 749 (5th Cir. 2014), the Fifth Circuit applied *Stewart* to conclude that a "floating oil and gas production facility moored on the Outer Continental Shelf" was not a vessel. *Id.* at 750-51. The panel declined to apply *Lozman*'s "reasonable observer" test because it applied only in "borderline cases where 'capacity' to transport over water is in doubt," and the floating production-facility was not a "borderline case." *Id.* at 752 n.5.

8

The district court opinions applying *Lozman* do not all agree that it applies only to "borderline" cases, but they acknowledge that *Stewart* remains largely intact. *See Martin v. Fab-Con, Inc.*, 9 F. Supp. 3d 642, 649 (E.D. La. 2014) (concluding that the "reasoning and result of *Lozman* compel[led] the conclusion" that a quarterbarge was not a vessel and distinguishing *Stewart* on the grounds that the quarterbarge "was incapable of moving under its own power, and even when it was being towed, it never transported a crew or cargo"); *Dune Energy v. Frogco Amphibious Equip.*, No. 11-3166, 2013 WL 1856058, at *4-5 (E.D. La. Apr. 30, 2013) (rejecting the plaintiff's reliance on pre-*Stewart* cases and applying *Lozman*'s "reasonable observer" test in concluding that a marsh buggy may (or may not) be a vessel); *Mooney v. W&T Offshore, Inc.*, No. 12–969, 2013 WL 828308, at *2-3 (E.D. La. March 6, 2013) (observing that *Lozman* "offered additional guidance" in "borderline cases where 'capacity' to transport over water is in doubt" and concluding that a tension-leg platform was not a vessel "[b]ased on the reasoning set forth in *Stewart, Lozman*, and *Mendez* [*v. Anadarko Petroleum Corp.*, 466 F. App'x 316 (5th Cir. 2012)]"); *Riley v. Alexander/Ryan Marine Servs. Co.*, 983 F. Supp. 2d 884, 889 n.3 (S.D. Tex. 2013) (applying *Stewart* and *Mendez* to conclude that a platform was not a vessel and observing that "*Lozman*—if anything—tightened the requirements for vessel status"); *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 2013 WL 311084, at *3-4 & n.7 (S.D.N.Y. Jan. 25, 2013) (applying "the standard outlined in *Lozman*" to conclude that a drydock was not a vessel but observing that the "*Lozman* Court affirmed *Stewart* on the ground that 'the dredge was regularly . . . used (and designed in part to be used) to transport workers and equipment over water. . . .'" (quoting *Lozman*, 133 S. Ct. at 742-43)).

9

## B. Contribution and Connection

For a claimant to be a seaman, his duties must contribute to a vessel's function or to accomplishing the vessel's mission, and he must have a connection to the vessel in navigation that is substantial in both duration and nature. *See Chandris*, 515 U.S. at 371; *McDermott*, 498 U.S. at 337. This two-part test distinguishes "sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation." *In Re Endeavor Marine Inc.*, 234 F.3d 287, 290 (5th Cir. 2000) (quoting *Chandris*, 515 U.S. at 368).

To satisfy the first element, a claimant must show that he "do[es] the ship's work." *See Chandris*, 515 U.S. at 369. This threshold showing is broad. It extends to all who work at sea in the ship's service. *Id.* (citing *McDermott*, 498 U.S. at 354). The second element does not look to the employee's particular job but to "the employee's connection to a vessel." *McDermott*, 498 U.S. at 354. A seaman must have an employment-related connection to a vessel in navigation, and the connection must be substantial in both duration and nature. *See Chandris*, 515 U.S. at 371. The Supreme Court has accepted as guidance the Fifth Circuit's test that "a worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act." *Id.*

The Supreme Court did not limit the seaman-status inquiry "exclusively to an examination of the overall course of a worker's service with a particular employer." *Chandris*, 515 U.S. at 371. The court noted that "[w]hen a maritime worker's basic assignment changes, his seaman status may change as well." *Id.* at 371–72 (citing *Barrett v. Chevron, U.S.A., Inc.*, 781 F.2d 1067, 1077 (5th Cir. 1986)). The test is not so stringent as to deny Jones Act coverage to someone who is injured shortly

10

after receiving a new assignment from a structure that is not a vessel to one that is. Rather, "the assessment of the substantiality of his vessel-related work [should be] made on the basis of his activities in his new position." *Id.* at 372.

The duration and nature of the seaman's employment are not "snapshot" tests of the moment of injury. *See Chandris*, 515 U.S. at 363. An employee injured while working on land may still have seaman status if his employment established a substantial connection to a vessel in navigation that consumed more than 30 percent of his time. *See Hebert v. Weeks Marine, Inc.*, 251 F. App'x 305, 307 (5th Cir. 2007). An employee dividing time between onshore and offshore work may not claim seaman status unless his offshore work is substantial in both nature and duration. *See Nunez v. B&B Dredging, Inc.*, 288 F.3d 271, 275–76 (5th Cir. 2002). A seaman must show that he "performed a significant part of his work aboard the ship with at least some degree of regularity and continuity." *Holland v. Allied Structural Steel Co.*, 539 F.2d 476, 484 (5th Cir. 1976) (citations omitted).

These legal criteria are applied to the evidence in the record.

## II. Analysis

The parties agree that the Genesis Spar is not a vessel. (*See* Docket Entry No. 12, at 5 ("Plaintiff acknowledges the case law [holding] that the Genesis Spar, which is stationary and does not move from its current location, is not a vessel.")). In *Channel v. Grand Isle Shipyard, Inc.*, No. 01-682, 2001 WL 515220, at *2 (E.D. La. 2001), the court applied *Fields* and concluded "that the Genesis Spar is a work platform and not a vessel" because it: (1) was built primarily to serve as a work platform and has never been located in any other spot than its current location; (2) was secured by 14 steel chain/wire rope anchor lines that are connected to massive pilings driven into the ocean;

11

and (3) had no transportation function beyond the occasional incidental movement and no organic means of propulsion. *See id.* at *2; *see also Am. Home Assur. Co. v. Chevron, USA, Inc.*, 400 F.3d 265, 267 (5th Cir. 2005) ("[I]t was determined that the Genesis Spar, on which Blackmon was injured, was a work platform rather than a vessel.").

Although *Channel* predated *Stewart* and *Lozman*, those cases do not undermine *Channel*'s conclusion that the Genesis Spar is not a vessel. In *Warrior Energy Services Corp. v. ATP Titan M/V*, 551 F. App'x 749 (5th Cir. 2014) (per curiam), the Fifth Circuit applied *Stewart* to conclude that the TITAN, "a floating oil and gas production facility moored on the Outer Continental Shelf," was not a vessel. *Id.* at 751. The court explained why the TITAN was "not practically capable of transportation on water":

> First, the TITAN is moored to the floor of the Outer Continental Shelf by twelve chain mooring lines connected to twelve anchor piles, each weighing 170 tons and each embedded over 200 feet into the seafloor, and by an oil and gas production infrastructure. Second, the TITAN has not been moved since it was constructed and installed at its current location in 2010. Third, the TITAN has no means of self-propulsion, apart from repositioning itself within a 200–foot range by manipulating its mooring lines. Fourth, moving the TITAN would require approximately twelve months of preparation, at least fifteen weeks for its execution, and would cost between $70 and $80 million.

*Id.* at 752 (citation omitted). The same reasoning applies to the Genesis Spar.[2]

---

[2] Because the case involving the TITAN was not a "borderline case[] where 'capacity' to transport over water [was] in doubt,'" the Fifth Circuit determined it did not need to apply *Lozman*'s "'reasonable observer' test." *Id.* n.5 (quoting *Lozman*, 133 S. Ct. at 745). The Fifth Circuit also observed that the *Lozman* test "would nonetheless lead to the same result, as, for the reasons already enumerated, no reasonable observer, looking to the TITAN's physical characteristics and activities, would consider it designed to a practical degree for water transportation." *Id.* (citing *Lozman*, 133 S. Ct. at 745). *See also Riley*, 983 F. Supp. 2d at 889 n.3 (observing that "*Lozman*—if anything—tightened the requirements for vessel status").

Nabors contends that Rig 85 is not a vessel, and the record supports this conclusion. Rig 85 is a drilling platform with no independent navigation characteristics and no living or dining quarters. It has been in the same place since 1997. (Docket Entry No. 13-1, at 2). It cannot self-propel, it does not float, and it must be attached to a spar. (*See id.*). It is not a vessel. *See Becker v. Tidewater, Inc.*, 335 F.3d 376, 391 (5th Cir. 2003) ("Fixed platforms are not vessels, and workers injured on them are covered under the LHWCA, not the Jones Act."); *see also Riley*, 983 F. Supp. 2d at 889 n.3 (observing that "*Lozman*—if anything—tightened the requirements for vessel status").

Badon argues that he nonetheless is a Jones Act seaman because he spent over 30 percent of his Nabors employment working on Barge 11, which the parties agree qualified as a vessel. "[A]s a general rule," a plaintiff seeking to recover as a seaman under the Jones Act "must . . . demonstrat[e] that 30 percent or more of his time is spent in service of [a] vessel" in navigation. *See Roberts v. Cardinal Servs., Inc.*, 266 F.3d 368, 375 (5th Cir. 2001); *see also Chandris*, 515 U.S. at 371 ("A worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act.").

Nabors agrees that Badon spent over 30 percent of his total time working for the company in service of Barge 11. But it argues that "the Supreme Court has articulated an exception to temporal guidelines, such as [the Fifth Circuit's] thirty-percent benchmark." *Becker*, 335 F.3d at 389. Even if the plaintiff previously worked in service of a vessel, "[w]hen a maritime worker's basic assignment changes, his seaman status may change as well." *Chandris*, 515 U.S. at 372. In *Chandris*, the Supreme Court provided the following examples of basic assignment changes that make the overall 30-percent rule inapplicable:

>we can imagine situations in which someone who had worked for years in an employer's shoreside headquarters is then reassigned to a ship in a classic seaman's job that involves a regular and continuous, rather than intermittent, commitment of the worker's labor to the function of a vessel. Such a person should not be denied seaman status if injured shortly after the reassignment, *just as someone actually transferred to a desk job in the company's office and injured in the hallway should not be entitled to claim seaman status on the basis of prior service at sea.* If a maritime employee receives a new work assignment in which his essential duties are changed, he is entitled to have the assessment of the substantiality of his vessel-related work made on the basis of his activities in his new position.

*Id.* (emphasis added).

Only a reassignment that "permanently change[s]" an employee's work status provides an exception to the 30-percent rule. *See Becker*, 335 F.3d at 390; *Martin v. Fab-Con, Inc.*, 7 F. Supp. 3d 645, 649 (E.D. La. 2014) ("The Fifth Circuit has held that, in order for this exception to the thirty percent test to apply, the reassignment must be permanent." (citing *Becker*)). "[P]ermanent" means "'for an indefinite period'—not temporary." *Smith v. Nicklos Drilling Co.*, 841 F.2d 598, 599 (5th Cir. 1988).

If Badon's reassignment from Barge 11 to Rig 85 was for an indefinite period, the 30-percent rule does not apply. He would be like the shipworker who transferred from a seaman's job to a land-based desk job shortly before he was hurt. He was, as a matter of law, no longer a seaman.

Nabors argues that the reassignment was indefinite because Barge 11 was decommissioned and sold in April 2014. Nabors submitted deposition and affidavit testimony about the Barge 11 decommissioning and sale. (Docket Entry No. 13-2, at 1; *see also id.* 13-1, at 6). Nabors's corporate representative, James Royal, and its supervisor of Human Resources, Jerry Poole, both testified that

14

Barge 11 was decommissioned and sold in April 2014. Badon could not have been reassigned to that vessel, and he was not scheduled for assignment to any other vessel. (*See id.*).

Badon contends that he was told that his reassignment would be temporary. He submitted an affidavit stating that before "coming onto Rig 85 in April [2014], [he] was told by the Nabors safety man Mike on Barge 11 that [he] would be temporarily filling in for someone on Rig 85. An individual from the Nabors corporate office also called and told [him] the same thing." (Docket Entry No. 12-7, ¶ 4). His affidavit states that "[t]he rig manager for Rig 85, K.P. told [him] the day [he] got on Rig 85 that [he] would be only working on the Rig 85 temporarily" because "a floorhand had gone home for an emergency." (*Id.*, ¶ 5). Badon's "driller and supervisor Justin . . . told [him he] was temporarily filling in for a floorhand." (Docket Entry No. 12-7). He also points to the fact that his employment file listed three events—his hiring, his transfer to Barge 11, and his failure to appear for a scheduled doctor's visit after the incident—but nothing about a permanent reassignment to Rig 85. (Docket Entry No. 12-4; 12-6). He argues that the court must resolve this factual dispute in his favor in deciding the motion.

The Fifth Circuit rejected a similar argument in *Smith v. Nicklos Drilling Co.*, 841 F.2d 598 (5th Cir. 1988). The plaintiff, Smith, had "worked for several years as a mechanic aboard the defendant's floating barge rig known as Nicklos Rig No. 20." *Id.* at 598. "When No. 20 was retired from service in October 1983, Smith was reassigned to a land rig; and three weeks later he was injured on that rig while attempting to repair an air hose." *Id.* "About the time of his injury, two new barge rigs had just been purchased and put into service by Nicklos to replace Rigs No. 20 and No. 21." *Id.* Smith argued that he qualified as a Jones Act seaman because "the newly-purchased rigs constituted part of Nicklos' 'fleet of vessels' and . . . he had been more or less permanently

assigned to Nicklos' fleet." *Id.* The court rejected Smith's argument that "the permanency of [Smith's] change should have been a fact for the jury to decide." *Smith*, 841 F.2d at 599. The court concluded that "both his work location and status were permanently changed when the floating rig on which he worked was decommissioned":

> Smith had not been assigned to a fleet of vessels; he had worked on one vessel for several years. Unlike cases where we look to see if the worker is moved frequently from vessel to vessel within a fleet so as to qualify the worker as a crewman on a "vessel", Smith had been permanently assigned to one barge rig which was removed from service. He was then reassigned to a land rig. It necessarily follows that Smith's regular assignment was changed when Nicklos Rig No. 20 was decommissioned.

*Id.* at 599.

Like the plaintiff in *Smith*, Badon worked on a single vessel for an extensive period before a transfer to the structure where he was injured. (Docket Entry No. 12-7, ¶ 2 ("I had worked as a floorhand for Nabors Offshore Corporation on Barge 11 continuously from January 2013 until roughly one month prior to my injury.")). In April 2014, Nabors "decommissioned and sold" Barge 11. (Docket Entry No. 13-2, at 1; *see also id.* 13-1, at 6). Even crediting Badon's assertion that he was told his reassignment to Rig 85 was temporary and "was never told . . . that [he] would not be returning to Barge 11," (Docket Entry No. 12-7, ¶ 6), he cannot genuinely dispute that "there was no possibility that he would return to Nabors' Barge Rig No. 11 because it had been sold." (Docket Entry No. 13-2, ¶ 6).

Like the plaintiff in *Smith*, Badon "had been permanently assigned to one barge rig"—Barge 11—"which was removed from service" "before the accident" on the structure where he was reassigned—Rig 85. *Smith*, 841 F.2d at 599. As a result, "[t]he permanency" of Badon's

reassignment "was undisputedly established when the old barge rig was finally removed from service; [Badon] was never to return to the status of crewmember on that vessel." *Id.*; *cf. Sepulvado v. Alpha Drilling, LLC*, 730 F. Supp. 2d 591, 602 (W.D. La. 2010) (distinguishing *Smith* because "in the present case, there [was] no indication that the D/B JUSTICE (or Axxis' fleet of vessels) has been sold or decommissioned"). Badon's affidavit statement that he was told his transfer was temporary does not create a genuine dispute material to deciding whether his reassignment was indefinite or temporary. Nabors has submitted undisputed evidence that Badon would never return to Barge 11 because it was decommissioned and sold. There is no evidence that Badon would be transferred to another vessel, much less to a specific vessel.

Badon cites *Bishop v. Chet Morrison Contractors, LLC*, No. 3:12-cv-165, 2012 WL 3648412 (S.D. Tex. Aug. 23, 2012), but that case is inapposite. *Bishop* held that the parties' genuine dispute as to whether the plaintiff "could exceed *Chandris*'s 30% benchmark" required remand. *Id.* at *4. The factual disputes in *Bishop* turned on how much time the plaintiff had spent on vessels as opposed to non-vessels. *See id.* at *3 ("[T]he relevant evidence comes down to Bishop's word that he performed most of his work on the JONI and other liftboats against Frazier and Pierce's word that he did not."). These disputes differ from the testimony that Badon was told his assignment to Rig 85 was temporary. *Bishop* did not consider the *Chandris* exception to the 30-percent rule, which applies when a plaintiff is permanently reassigned from a vessel. *Smith* holds that an employee is permanently reassigned from a vessel, as a matter of law, when that vessel is decommissioned and sold. Badon was injured after he had been transferred to a structure that was not a vessel. There is no reasonable possibility that Badon can establish he is a Jones Act seaman, even accepting his

17

assertion that he was told the assignment to Rig 85 would be temporary. His case was properly removed.

**III.  Conclusion**

Badon's motion to remand, (Docket Entry No. 12), is denied. The parties are scheduled to appear for a status and scheduling conference on **March 20, 2015**, at 8:30 a.m. in Courtroom 11-B at 515 Rusk Street, Houston, Texas, 77002.

SIGNED on March 4, 2015, at Houston, Texas.

*[signature]*

Lee H. Rosenthal
United States District Judge